ANDREW L. PACKARD (State Bar No. 168690)
MEGAN E. TRUXILLO (State Bar No. 275746)
JOHN J. PRAGER (State Bar No. 289610)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: Andrew@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE, a non-profit
corporation,

        Plaintiff,

vs.

METECH INTERNATIONAL, LLC,
METECH RECYCLING, INC. and
JOSEPH FULTON,

        Defendant.

Case No. **5:14-cv-03484-HRL**

**STIPULATION TO DISMISS PLAINTIFF'S CLAIMS WITH PREJUDICE; [PROPOSED] ORDER GRANTING DISMISSAL WITH PREJUDICE [FRCP 41(a)(2)]**

[Re:  Dkt. 7]

        Plaintiff California Sportfishing Protection Alliance ("CSPA") and all Defendants in the above-captioned action, stipulate as follows:

        WHEREAS, on or about June 2, 2014, CSPA provided all Defendants with a Notice of Violations and Intent to File Suit ("60-Day Notice Letter") under Section 505 of the Federal Water Pollution Control Act ("Act" or "Clean Water Act"), 33 U.S.C. § 1365;

        WHEREAS, on August 1, 2014, CSPA filed its Complaint against Defendants in this Court, and said Complaint incorporated by reference all of the allegations contained in CSPA's 60-Day Notice Letter;

        WHEREAS, CSPA and Defendants, through their authorized representatives and without either adjudication of CSPA's claims or admission by Defendants of any alleged

violation or other wrongdoing, have chosen to resolve in full by way of settlement the allegations of CSPA as set forth in CSPA's 60-Day Notice Letter and Complaint, thereby avoiding the costs and uncertainties of further litigation.  A copy of the Parties' proposed consent agreement ("Consent Agreement") entered into by and between CSPA and Defendants is attached hereto as **Exhibit A** and incorporated by reference;

WHEREAS, CSPA has submitted the Consent Agreement via certified mail, return receipt requested, to the U.S. EPA and the U.S. Department of Justice ("the agencies") and the 45-day review period set forth at 40 C.F.R. § 135.5 has now expired;

NOW THEREFORE, IT IS HEREBY STIPULATED and agreed to by and between the Parties that CSPA's claims, as set forth in its 60-Day Notice Letter and Complaint, be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2).  The Parties respectfully request an order from this Court dismissing such claims with prejudice.  In accordance with Paragraph 18 of the Consent Agreement, the Parties also request that this Court retain and have jurisdiction over the Parties through September 30, 2016, for the sole purpose of resolving any disputes between the Parties with respect to enforcement of any provision of the Consent Agreement.

Dated: December 18, 2014             Respectfully submitted,
                                     LAW OFFICES OF ANDREW L. PACKARD


                                     By: /s/ Andrew L. Packard_____
                                     Andrew L. Packard
                                     Attorneys for Plaintiff
                                     CALIFORNIA SPORTFISHING
                                     PROTECTION ALLIANCE

Dated: December 18, 2014             BARG COFFIN LEWIS & TRAPP, LLP

                                     By: /s/ Donald E. Sobelman_____
                                     Attorneys for Defendants
                                     METECH INTERNATIONAL, LLC, METECH
                                     RECYCLING, INC. and JOSEPH FULTON

**<u>ORDER</u>**

Good cause appearing, and the Parties having stipulated and agreed,

IT IS HEREBY ORDERED that Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE's claims against Defendants METECH INTERNATIONAL, LLC, METECH RECYCLING, INC. and JOSEPH FULTON, as set forth in CSPA's 60-Day Notice Letter and Complaint, are hereby dismissed with prejudice, each side to bear their own attorney fees and costs, except as provided for by the terms of the accompanying Consent Agreement.

IT IS FURTHER ORDERED that the Court shall retain and have jurisdiction over the Parties with respect to disputes arising under the Consent Agreement attached to the Parties' Stipulation to Dismiss as Exhibit A until September 30, 2016.

IT IS SO ORDERED.

Dated: December 23, 2014
_____

_____
UNITED STATES DISTRICT COURT JUDGE
MAGISTRATE
HOWARD R. LLOYD

**EXHIBIT A**

ANDREW L. PACKARD (State Bar No. 168690)
MEGAN E. TRUXILLO (State Bar No. 275746)
JOHN J. PRAGER (State Bar No. 289610)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: Andrew@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation, <br><br> Plaintiff, <br><br> vs. <br><br> METECH INTERNATIONAL, LLC, METECH RECYCLING, INC. and JOSEPH FULTON, <br><br> Defendants. | Case No.  5:14-cv-03484-HRL <br><br> ~~[PROPOSED]~~ CONSENT AGREEMENT <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

**WHEREAS**, Plaintiff California Sportfishing Protection Alliance (hereinafter "CSPA") is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California's waters;

**WHEREAS**, defendant Metech Recycling, Inc. ("MRI") operates an approximately 3-acre electronic waste recycling facility located in Gilroy, California (the "Facility"), defendant Joseph Fulton is a former employee of MRI, and defendant Metech International, LLC operated the Facility prior to January 2007 and was the named permittee for the Facility until August 7, 2014  (collectively, "Defendants");

WHEREAS, CSPA and Defendants collectively shall be referred to as the "Parties" to this Consent Agreement ("Agreement");

WHEREAS, the Facility collects and discharges storm water from the Facility into Llagas Creek, which then conveys that storm water into the Pajaro River, which ultimately flows into Monterey Bay (a map of the Facility is attached hereto as **Exhibit A** and incorporated herein by reference);

WHEREAS, storm water discharges associated with industrial activity are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 91-13-DWQ (as amended by Water Quality Order 92-12 DWQ and 97-03-DWQ), issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342 (hereinafter "General Permit");

WHEREAS, effective July 15, 2015, storm water discharges associated with industrial activity will be regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 2014-0057-DWQ (as amended by Water Quality Order 92-12 DWQ and 97-03-DWQ, issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342 (hereinafter "New General Permit");

WHEREAS, on or about June 6, 2014, Plaintiff provided notice of Defendants' alleged violations of the Act ("Notice Letter"), and of its intention to file suit against Defendants and others, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the U.S. Attorney General; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"); and to Defendants, as required by the Act, 33 U.S.C. § 1365(b)(1)(A) (a true and correct copy of CSPA's Notice Letter is attached as **Exhibit B** and incorporated herein by reference);

WHEREAS, Defendants deny the occurrence of the violations alleged in the Notice

- 2 -

1  Letter and maintain that they have complied at all times with the provisions of the General

2  Permit and the Clean Water Act;

3      **WHEREAS,** on July 30, 2014, MRI allegedly implemented a revised storm water

4  pollution prevention plan ("SWPPP") at the Facility that allegedly included new and modified

5  best management practices ("BMPs") for controlling and reducing the levels of potential

6  pollutants in the Facility's storm water discharges, consistent with the General Permit.

7      **WHEREAS**, on August 1, 2014, CSPA initiated this civil action by filing a complaint

8  against Defendants in the United States District Court, Northern District of California, which

9  asserts claims under the Clean Water Act based on the allegations in the Notice Letter  ("the

10  Action");

11      **WHEREAS**, the Parties agree that it is in their mutual interest to resolve this matter

12  without litigation and to enter into this Agreement;

13      **WHEREAS**, for purposes of this Agreement, the Parties stipulate that venue is proper

14  in this Court, and that Defendants do not contest the exercise of jurisdiction by this Court to

15  dismiss this matter with prejudice under the terms of this Agreement;

16      **WHEREAS**, this Agreement shall be submitted to the United States Department of

17  Justice for the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c); and shall

18  thereafter be submitted for approval by the Court, the date of which approval shall be referred

19  to herein as the "Court Approval Date;"

20      **WHEREAS,** at the time the Agreement is submitted for approval to the United States

21  District Court, CSPA shall submit a Notice of Settlement and inform the Court of the expected

22  dismissal date;

23      **AND WHEREAS**, upon expiration of the statutory review period, the Parties shall file

24  with the Court a Stipulation and Order that shall provide that the Action and all claims asserted

25  therein against all Defendants shall be dismissed with prejudice pursuant to Federal Rule of

26  Civil Procedure 41(a)(2),  and that this Court shall retain jurisdiction for the enforcement of

27  this Agreement as provided herein (the date of entry of the Order to dismiss shall be referred to

28

herein as the "Court Approval Date").

NOW, THEREFORE, IN FULL CONSIDERATION OF THE FOREGOING
RECITALS AND THE MUTUAL AGREEMENTS AND RELEASES CONTAINED IN
THIS AGREEMENT, THE PARTIES AGREE AS FOLLOWS:

## I.    COMMITMENT OF MRI

**1.    Compliance With General Permit & Clean Water Act.**  From the time of the
Court Approval Date and throughout the term of this Agreement, MRI shall continue
implementing all measures needed to operate the Facility in compliance with the requirements
of the General Permit, the New General Permit, and the Clean Water Act, subject to any
defenses available under the law.

**2.    Implementation of Specific Storm Water Best Management Practices.**
Unless otherwise specified, no later than November 15, 2014, MRI shall complete the
implementation of the following storm water control measures/ BMPs:

(a)    **Improved Sediment Filtration at All Facility Drop Inlets**.  MRI shall fit
all of the Facility's drain inlets with "witch hats" or similar fabric filtration to reduce
total suspended solid levels, on or before December 15, 2014.  MRI shall conduct
monthly cleaning and inspection of all drop inlets during the Wet Season (October 1-
May 31), with cleaning and inspection logs recorded and kept with the SWPPP.  MRI
shall undertake comprehensive repair and, if needed, replacement of each of these
devices in September of each Dry Season (June 1- September 30).  MRI shall cover all
facility drop inlets with durable lids for the duration of the Dry Season to prevent the
accumulation of debris.

(b)    **Facility Resurfacing.**  MRI shall resurface the outdoor ground surfaces of
the Facility identified by the diagonal shading on the map attached hereto as **Exhibit C**,
which include all asphalt areas other than the Facility's public parking lot, but do not
include the Facility's concrete aprons, slabs, and loading docks, on or before November
1, 2014.

- 4 -

(c) **Storage of All Materials Outdoors/Improved Tarping**.  MRI shall implement and maintain a system for the continuous tarping and/or overhead coverage of all equipment, inventory, electronic waste and any other materials stored outdoors at the Facility.  MRI shall modify its daily inspection logs to include review of tarping and overhead coverage for all outdoor materials storage at the Facility.

(d) **Sweeping Program**.   The parties disagree about whether regenerative sweeping (as opposed to conventional sweeping) is appropriate for the Facility.  In light of the fact that Defendants have agreed to resurface the majority of the outdoor portions of the Facility, including all asphalted areas other than the public parking lot (see Paragraph 2(b), above), and the likelihood that most, if not all, of the significant surface cracks at the Facility have been eliminated, Defendants agree to conduct weekly conventional sweeping of all exterior areas of the Facility during the Wet Season, and monthly conventional sweeping of those areas during the Dry Season.   All such sweeping shall be inspected by the SWPPP Team Leader, and logged in the revised Facility SWPPP.   In the event that EPA Benchmark Value exceedences continue to occur during the term of this Agreement, Defendants shall meaningfully explore the possibility of instituting a robust regenerative sweeping program at the Facility as part of the BMP review described in Paragraph 2(m) below and the Action Memorandum process described in Paragraph 6, below.

(e) **Interior Sweeping Program To Reduce Tracking.**  MRI shall implement a robust interior sweeping program that focuses on particulate removal in the interior areas immediately adjacent to all entry/exit bays at the Facility, and including but not limited to daily sweeping of all disassembling areas and mechanical processing locations.  MRI shall also install small berms or rumble strips at all entry/exit bays at the Facility.  MRI shall bi-annually train its entire production workforce regarding good housekeeping, logging all such training in the Facility SWPPP.

- 5 -

(f) **Elimination of Run-On**.  MRI shall berm or otherwise improve all run-on locations at the Facility so as to eliminate any run-on to the Facility, on or before November 1, 2014.

(g) **Rain Gage Installation.**  MRI shall install an automated rain gauge, to collect rain data after each rain event and to log all of the rain data collected in the Facility's SWPPP.

(h) **Spill Response/Spill Kits.**  MRI shall implement a spill response protocol, combined with the installation of spill response kits at strategically located places around the entire Facility.  MRI shall biannually train all employees working in process areas in spill response, containment, recovery and decontamination, logging all such training in the revised Facility SWPPP.  All spill kit locations shall be identified in the revised Facility SWPPP map.

(i) **Revised SWPPP Mapping.**  As part of the SWPPP update specified in Paragraph 3, below, MRI shall update the Facility SWPPP map to ensure compliance with Section A(4) of the General Permit, including but not limited to the inclusion of all discharge point locations, drop inlets, subsurface connections of same, the delineation of sub-watershed within the Facility, all flow directions, identity and location of activities generating pollutants, the major structural BMPs, and the location of the automated rain gage.

(j) **Facility Roof Downspouts.**  MRI shall retrofit all Facility roof downspouts with Ultra Tech Ultra Filter™, or substantially similar, metals-absorbing media filtration where flows are released to the Facility's surface.  MRI shall also replace or repair all damaged downspout conveyances.  These measures shall be completed on or before December 15, 2014.

(k) **Improved/Heightened Storm Water Monitoring; Inspection & Repair of Facility Collection & Discharge Points**.  MRI shall implement a formal written Monitoring & Reporting Program that incorporates the following elements: all samples

- 6 -

should be collected using a universal sampler after it passes through the last BMP; and heightened sampling as specified in Paragraph 4, below.  All Facility collection and discharge points shall be thoroughly inspected (and repaired, if needed) on a weekly basis during the Wet Season and on a monthly basis during the Dry Season.

(l)      **Increased Training & Reporting**.  MRI shall implement a training and reporting program that includes: bi-annual meetings of the Storm Water Pollution Prevention Team, held September 15th and January 15th so as to ensure the capturing of the first event and subsequent storm events in its sampling analysis as well as to ensure that the monthly Wet Season visual monitoring is properly conducted and reported in the Annual Report.

(m)      **Evaluation And Implementation of Additional Structural and Non-Structural BMPs.**  The Parties agree that a thorough evaluation of the performance of the new BMPs implemented by MRI in its July 2014 SWPPP and pursuant to this agreement is warranted after the 2014-2015 Wet Season.  In the event that the Benchmark Values set forth on **Exhibit D** are exceeded at any time during the 2014-2015 or 2015-16 Wet Seasons, MRI agrees to evaluate and implement additional structural and/or non-structural BMPs specifically tailored to address those exceedances, consistent with the General Permit and New General Permit's requirement that MRI control storm water pollutant discharges using BAT and BCT standards.  At minimum, MRI shall evaluate both (i) revising its Sweeping Program described at Paragraph 2(d), above, to require sweeping with a regenerative sweeper, and (ii) aggregation of storm water flow from the current three drop-inlets at the Facility prior to discharge into a three-chambered settling tank fitted with Metalsorb™ (or similar filtration media for the removal of metals) and meeting the standards set forth in the New General Permit at Section X.H.6 ("Design Storm Standards for Treatment Control BMPs").  If MRI decides not to implement these significant BMPs, MRI shall explain how other new or modified BMPs to be implemented at the Facility before the following Wet Season are

- 7 -

reasonably likely to be of equal or greater efficacy in addressing the exceedances of the Benchmark Values.  This explanation shall be included in an Action Memorandum prepared in accordance with Paragraph 6, below.  If MRI asserts that either BMP is economically infeasible, MRI shall include in the Action Memorandum a detailed cost estimate for the BMP and an explanation as to why that cost renders the BMP infeasible at the Facility.

3.      **SWPPP Amendments.**  Within thirty (30) days of the Court Approval Date, MRI shall formally amend the Facility SWPPP to incorporate all items specified in Paragraph 2, above, and all other relevant requirements of this Agreement.

4.      **Sampling Frequency.**  MRI shall collect and analyze samples from storm water discharges during at least three (3) storm events in the 2014-2015 Wet Season that meet the conditions of Section B.5.b of the General Permit, and at least five (5) "Qualifying Storm Events" in the 2015-2016 Wet Season, as defined in Section XI.B.1 of the New General Permit.  The storm water sample results shall be compared with the EPA Benchmark Values set forth in **Exhibit D**, attached and incorporated herein by reference.  If the results of any such samples exceed the EPA Benchmark Values set forth in **Exhibit D**, MRI shall comply with the "Action Memorandum" requirements set forth below.

5.      **Sampling Parameters.**  All samples shall be analyzed for each of the constituents listed in **Exhibit D** by a laboratory ELAP-accredited by the State of California, except as specified below.  All samples collected from the Facility shall be delivered to the laboratory as soon as possible to ensure that sample "hold time" is not exceeded.  Analytical methods used by the laboratory shall be adequate to detect the individual constituents at or below the values specified on **Exhibit D**.  Sampling results shall be provided to CSPA within ten (10) business days of MRI's receipt of the laboratory report from each sampling event pursuant to the Notice provisions below.  If, after the Court Approval Date (or in the case of copper, during the 2015-16 Wet Season), four consecutive analyses of biological oxygen demand, copper, magnesium, cadmium, mercury, silver, and/or arsenic are "non-detect" at any

1   discharge point then MRI shall not be required to test for that parameter at that discharge point

2   in subsequent sampling events; however, this term shall not apply if Defendants fail to conduct

3   all sampling required under this Agreement during the time period in which the four

4   consecutive samples are taken.

5       6.      **"Action Memorandum" Trigger; CSPA Review of "Action Memorandum";**

6   **Meet-and-Confer.**  If any sample taken during the 2014-2015 Wet Season or the 2015-2016

7   Wet Season exceeds the EPA Benchmark Value set forth in **Exhibit D**, or if MRI fails to

8   collect and analyze samples from the number of events required above, then MRI shall prepare

9   a written statement discussing the exceedance(s) and/or failure to collect and analyze samples

10  from the required number of storm events, the possible cause and/or source of the

11  exceedance(s), and additional measures that will be taken to address and eliminate future

12  exceedances and/or failures to collect required samples (the written statement shall be referred

13  to herein as the "Action Memorandum").  The Action Memorandum shall be provided to

14  CSPA not later than July 15 following the conclusion of each Wet Season.  Recognizing that a

15  SWPPP is an ongoing iterative process meant to encourage innovative BMPs, such additional

16  measures may include, but are not limited to, improving housekeeping procedures, taking

17  confirmation samples, making further material improvements to the storm water collection and

18  discharge system, changing the type and frequency of Facility sweeping, changing the type and

19  extent of storm water filtration media, or modifying other BMPs at the Facility.  Such

20  additional measures, to the extent reasonably feasible, shall be implemented within sixty (60)

21  days after the due date of the Action Memorandum.  Within thirty (30) days of

22  implementation, the Facility SWPPP shall be amended to include all additional BMP measures

23  designated in the Action Memorandum.  CSPA may review and comment on an Action

24  Memorandum and suggest any additional pollution prevention measures it believes are

25  appropriate; however, CSPA's failure to do so shall not be deemed to constitute agreement

26  with the proposals set forth in the Action Memorandum.  MRI shall not be obligated to

27  perform any of the pollution prevention measures CSPA may suggest (unless CSPA invokes

28

the assistance of the Court to resolve a dispute regarding the sufficiency of an Action

Memorandum and obtains an order requiring MRI to undertake such measures), but shall give

good faith consideration to those measures.  Upon request by CSPA, MRI agrees to meet and

confer in good faith (at the Facility, if requested by Plaintiff) regarding the contents and

sufficiency of the Action Memorandum.

       **7.**      **Inspections During The Term Of This Agreement.**  In addition to any site

inspections conducted as part of the settlement process and the meet-and-confer process

concerning an Action Memorandum as set forth above, MRI shall permit representatives of

CSPA to perform up to two (2) physical inspections of the Facility during the term of this

Agreement.  These inspections shall be performed by CSPA's counsel and consultants and

may include sampling, photographing, and/or videotaping.  All sampling shall be conducted by

a qualified sampler, with a split sample provided to both CSPA and MRI at the time of

sampling.  CSPA shall provide MRI with a copy of all sampling reports, photographs and/or

video within a reasonable time after the site inspection, not to exceed fourteen (14) days after

CSPA's receipt of any sampling reports from split samples, and seven (7) days after the site

inspection, for photographs and/or video.  CSPA shall provide at least two (2) business days

advance notice of such physical inspection, except that MRI shall have the right to deny access

if circumstances would make the inspection unduly burdensome and pose significant

interference with business operations or any party/attorney, or the safety of individuals.  In

such case, MRI shall specify at least three (3) dates within the two (2) weeks thereafter upon

which a physical inspection by CSPA may proceed.  MRI shall document any alterations to

Facility conditions related to storm water management during the period between receiving

CSPA's initial advance notice and the start of CSPA's inspection that MRI would not

otherwise have made but for receiving notice of CSPA's request to conduct a physical

inspection of the Facility.  The documentation shall include the date the alterations related to

storm water management were planned and/or scheduled, the date of the issuance of any

purchase order and/or maintenance order, if any, for the alterations, and the date the alterations

- 10 -

1  were implemented.  Nothing herein shall be construed to prevent MRI from continuing to

2  implement any BMPs identified in the SWPPP during the period prior to an inspection by

3  CSPA or at any time.

4      **8.      MRI Communications To/From Regional and State Water Boards.**  During

5  the term of this Agreement, MRI shall provide CSPA with copies of all documents submitted

6  to, or received from, the Regional Water Board or the State Water Board concerning storm

7  water discharges from the Facility, including, but not limited to, all documents and reports

8  submitted to the Regional Water Board and/or State Water Board as required by the General

9  Permit.  Such documents and reports shall be provided to CSPA pursuant to the Notice

10 provisions herein and within five (5) days of MRI's submission(s) to, or receipt from, such

11 agencies.

12     **9.      SWPPP Amendments.**  Pursuant to the Notice provisions herein, MRI shall

13 provide CSPA with a copy of any amendments to the Facility SWPPP made during the term of

14 the Agreement within fifteen (15) days of such amendment.

15 **II.    MITIGATION, COMPLIANCE MONITORING AND FEES AND COSTS**

16     **10.      Mitigation Payment.**  As mitigation to address the Clean Water Act violations

17 alleged in CSPA's Complaint against Defendants, and in lieu of any civil penalty assessment

18 against Defendants in connection with those alleged violations, MRI agrees to pay the sum of

19 $45,000 to the Rose Foundation for Communities and the Environment ("Rose Foundation")

20 for projects to improve water quality in Llagas Creek, the Pajaro River, and/or the Monterey

21 Bay.  Such mitigation payment shall be remitted directly to the Rose Foundation at: Rose

22 Foundation, Attn: Tim Little, 1970 Broadway, Suite 600, Oakland, CA 94612 within fifteen

23 (15) days of the Court Approval Date.

24     **11.      Compliance Monitoring Funding.**  To defray CSPA's reasonable

25 investigative, expert, consultant and attorneys' fees and costs associated with monitoring

26 MRI's compliance with this Agreement, MRI agrees to remit $4,500 for each of the two Wet

27 Seasons covered by this Agreement ($9,000 total for the life of the Agreement), to a

28

- 11 -

compliance monitoring fund maintained by counsel for CSPA as described below.  Payment shall be made payable to the "Law Offices of Andrew L. Packard Attorney-Client Trust Account" and remitted to Plaintiff's counsel within fifteen (15) days of the Court Approval Date.  Compliance monitoring activities may include, but shall not be limited to, site inspections, review of water quality sampling reports, review of annual reports, discussions with representatives of MRI concerning the Action Memoranda referenced above, and potential changes to compliance requirements herein, preparation for and participation in meet-and-confer sessions, water quality sampling and analysis, and compliance-related activities.

12.   **Reimbursement of Fees & Costs.**  MRI agrees to reimburse CSPA in the amount of $35,000 to defray CSPA's reasonable investigative, expert, consultant and attorneys' fees and costs, and all other costs incurred as a result of investigating the activities at the Facility, bringing the Action, and negotiating a resolution in the public interest.  Within seven (7) days of the Court Approval Date, CSPA shall provide MRI with an accounting showing the components of these fees and costs by entity/person and general subject matter, but shall not be required to disclose any information protected by the attorney-client privilege and/or attorney work product doctrine.  Payment shall be made payable to the "Law Offices of Andrew L. Packard Attorney-Client Trust Account" and remitted to Plaintiff's counsel within fifteen (15) days of the Court Approval Date.

III.   **DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT AGREEMENT**

13.   With the exception of the timelines set forth above for addressing exceedances of values specified on **Exhibit D** and Action Memoranda, if a dispute under this Agreement arises, or either Party believes that a breach of this Agreement has occurred, the Parties shall meet and confer within seven (7) days of receiving written notification from the other Party of a request for a meeting to determine whether a violation has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute.  If the Parties fail to meet and confer, or the meet-and-confer does not resolve the issue, after at least seven (7) days have passed after the meet-and-confer occurred or should have occurred, either

1  Party shall be entitled to all rights and remedies under the law, including filing a motion with

2  the District Court of California, Northern District, which shall retain jurisdiction over the

3  Action for the limited purposes of enforcement of the terms of this Agreement.  The Parties

4  shall be entitled to seek fees and costs incurred in any such motion, and such fees and costs

5  shall be awarded, pursuant to the provisions set forth in Section 505(d) of the Clean Water

6  Act, 33 U.S.C. §1365(d), and applicable case law interpreting such provisions.

7  **IV.**   **WAIVERS AND RELEASES**

8      **14.**      **CSPA's Waiver and Release.**   Upon the Court Approval Date of this

9  Agreement, CSPA, on its own behalf and on behalf of its members, subsidiaries, successors,

10  assigns, directors, officers, agents, attorneys, representatives, and employees, releases

11  Defendants and their officers, directors, employees, shareholders, parents, subsidiaries, and

12  affiliates, and each of their predecessors, successors and assigns, and each of their agents,

13  attorneys, consultants, and other representatives (each a "Released Defendant Party") from,

14  and waives all claims which arise from or pertain to the Action, including, without limitation,

15  all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including

16  fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or

17  which could have been claimed in this Action, for the alleged failure of Defendants to comply

18  with the General Permit or the Clean Water Act at the Facility, up to the Court Approval Date.

19  During the term of the Consent Agreement, CSPA agrees that neither CSPA, its officers,

20  executive staff, or members of its governing board, nor any organization under the control of

21  CSPA, will file or support any lawsuit against Defendants seeking relief for alleged violations

22  of the Clean Water Act, the General Permit, or the New General Permit at the Facility.  During

23  the term of this Agreement, enforcement of the Agreement is CSPA's exclusive remedy for

24  any violation of the terms contained herein, except that CSPA shall be entitled to seek, and the

25  Court may award, appropriate sanctions for any violations of this Agreement, to the extent

26  such sanctions are otherwise authorized by law.

27      **15.**      **Defendants' Waiver and Release.**  Upon the Court Approval Date of this

28

- 13 -

Agreement, Defendants, on their own behalf and on behalf of any Released Defendant Party under their control, releases CSPA (and its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and its agents, attorneys, and other representative) from, and waives all claims which arise from or pertain to the Action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters associated with or related to the Action.

16.     **Scope of Mutual Releases.**  It is understood and agreed by the Parties that the released claims include all claims of every nature and kind whatsoever, whether known or unknown, suspected, or unsuspected, and all rights under section 1542 of the California Civil Code are hereby expressly waived. Section 1542 provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the Release, which if known by him or her must have materially affected his or her settlement with the debtor.

The Parties acknowledge that they may hereafter discover facts different from, or in addition to, those which they now know or believe to be true with respect to the released claims, and the Parties agree that this Agreement, including, without limitation, the releases contained herein, shall be and remain effective in all respects notwithstanding such different or additional facts or the discovery thereof.

V.     <u>AGENCY REVIEW AND DISMISSAL OF ACTION</u>

17.     Within five (5) business days of the mutual execution of this Agreement, Plaintiff shall submit this Agreement to the United States Department of Justice ("DOJ") for the statutory 45-day agency review period set forth in 33 U.S.C. §1365(c) and submit a Notice of Settlement to the federal District Court.

18.     Within seven (7) days of the expiration of the agency review period, the Parties shall file with the Court a Stipulation and Order providing that:

a.     the Complaint and all claims therein shall be dismissed with prejudice

- 14 -

pursuant to Federal Rule of Civil Procedure 41(a)(2); and,

b.      the Court shall retain and have jurisdiction over the Parties with respect to disputes arising under this Agreement.  Nothing in this Agreement shall be construed as a waiver of any Party's right to appeal from an order that arises from an action to enforce the terms of this Agreement.

## VI.   NO ADMISSION

19.      The Parties enter into this Agreement for the purpose of avoiding prolonged and costly litigation.  Nothing in this Agreement shall be construed as, and MRI expressly does not intend to imply, any admission as to any fact, finding, conclusion, issue of law, or violation of law, nor shall compliance with this Agreement constitute or be construed as an admission by MRI of any fact, finding, conclusion, issue of law, or violation of law.  However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Agreement.

## VII.   MISCELLANEOUS PROVISIONS

20.      The Agreement shall be effective upon mutual execution by all Parties, but shall not be enforceable until the Court Approval Date.  The Agreement shall terminate on September 30, 2016.

21.      The Agreement may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.  An executed copy of this Agreement shall be valid as an original.

22.      In the event that any one of the provisions of this Agreement is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

23.      The language in all parts of this Agreement, unless otherwise stated, shall be construed according to its plain and ordinary meaning.  This Agreement shall be construed pursuant to California law, without regard to conflict of law principles.

24.      The undersigned are each authorized to execute this Agreement on behalf of their respective Parties and have read, understood and agreed to be bound by all of the

- 15 -

applicable terms and conditions of this Agreement.

25.    All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Agreement are contained herein. This Agreement and its attachments are made for the sole benefit of the Parties, and no other person or entity shall have any rights or remedies under or by reason of this Agreement, unless otherwise expressly provided for therein.

26.    **Notices.**  Any notices or documents required or provided for by this Agreement or related thereto that are to be provided to CSPA pursuant to this Agreement shall be hand-delivered or sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

> Bill Jennings, Executive Director
> California Sportfishing Protection Alliance
> 3536 Rainier Avenue
> Stockton, CA 95204
> E-mail: DeltaKeep@me.com

> With copies sent to:

> Andrew L. Packard
> Law Offices of Andrew L. Packard
> 100 Petaluma Boulevard North, Suite 301
> Petaluma, CA 94952
> Tel:  (707) 763-7227
> E-mail: Andrew@packardlawoffices.com

Any notices or documents required or provided for by this Agreement or related thereto that are to be provided to MRI pursuant to this Agreement shall be sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

> Richard Chenoweth
> Metech Recycling, Inc
> 6200 Engle Way
> Gilroy, CA 95020
> rchenoweth@metechrecycling.com

> With copies sent to:

> Donald E. Sobelman, Esq.
> Barg Coffin Lewis & Trapp, LLP

- 16 -

350 California Street, 22nd Floor
San Francisco, CA 94104
des@bcltlaw.com

Each Party shall promptly notify the other of any change in the above-listed contact information.

27.      Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

28.      **Force Majeure.**  No Party shall be considered to be in default in the performance of any of its obligations when a failure to perform is due to a "Force Majeure."  A Force Majeure event is any circumstance beyond the Party's control, including, without limitation, any act of God, war, fire, earthquake, flood, and restraint by court order or public authority.  A Force Majeure event does not include normal inclement weather, such as anything less than or equal to a 100 year/24-hour storm event, or inability to pay.  Any Party seeking to rely upon this paragraph shall have the burden of establishing that it could not reasonably have been expected to avoid, and which by exercise of due diligence has been unable to overcome, the Force Majeure.

29.      **Impossibility of Performance.**  Where implementation of the actions set forth in this Consent Agreement becomes impossible within the deadlines set forth in those paragraphs, despite the timely good faith efforts of the Parties, the party who is unable to comply shall notify the other in writing within seven (7) business days of the date that the failure becomes apparent, and shall describe the reason for the nonperformance.  The Parties agree to meet and confer in good faith concerning the non-performance pursuant to Paragraph 13, above.  If the Parties concur that the non-performance was or is impossible, despite the timely good faith efforts of one of the Parties, new performance deadlines shall be established. In the event that the Parties cannot timely agree upon the terms of such a stipulation, either Party shall have the right to seek enforcement of this agreement as provided in Paragraph 13, above.

30.      If for any reason the Court should decline to approve this Agreement in the form presented, the Parties shall use their best efforts to work together to modify the

- 17 -

1  Agreement within thirty (30) days so that it is acceptable to the Court.  If the Parties are unable

2  to modify this Agreement in a mutually acceptable manner, this Agreement shall become null

3  and void.

4      **31.**     This Agreement shall be deemed to have been drafted equally by the Parties,

5  and shall not be interpreted for or against any Party on the ground that any such Party drafted

6  it.

7      **32.**     This Agreement and the attachments contain all of the terms and conditions

8  agreed upon by the Parties relating to the matters covered by the Agreement, and supersede

9  any and all prior and contemporaneous agreements, negotiations, correspondence,

10  understandings, and communications of the Parties, whether oral or written, respecting the

11  matters covered by this Agreement.  This Agreement may be amended or modified only by a

12  writing signed by the Parties or their authorized representatives.

13      **33.**     Except in case of an emergency but subject to the regulatory authority of any

14  applicable governmental authority, any breach of or default under this Agreement capable of

15  being cured shall be deemed cured if, within five (5) business days of first receiving notice of

16  the alleged breach or default, or within such other period approved in writing by the Party

17  making such allegation, which approval shall not be unreasonably withheld, the party allegedly

18  in breach or default has completed such cure or, if the breach or default can be cured but is not

19  capable of being cured within such five (5) business day period, has commenced and is

20  diligently pursuing to completion such cure.

21      The Parties hereto enter into this Agreement and respectfully submit it to the Court for

22  its approval and entry.

23

24  Dated: _28 Oct____, 2014          California Sportfishing Protection Alliance

25

26                                  By: _Bill Jennings_____

27                                  Bill Jennings, Executive Director

28

- 18 -

[PROPOSED] CONSENT AGREEMENT                     Case No.  5:14-cv-03484-HRL

Dated: 10-30- , 2014

Metech Recycling, Inc., for itself and as successor to Metech International, LLC

By: _____

Richard Chenoweth, President

Dated: 30 Oct 14 , 2014

Joseph Fulton

By: _____

Joseph Fulton

[PROPOSED] CONSENT AGREEMENT                    Case No.  5:14-cv-03484-HRL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A – Facility Site Map**



Baghouse 1
Shredding room 1
Baghouse 2
Shredding room 2
office
office
Sorting
bailer
Baghouse
(No longer in use)
Control Room
Storm Drain A
Filter Sock
Concrete Slab
Semi-Permanate Cover
Compressor
Blind Sump
(No Discharge)
Isolation Room
Maintenance
Dismantling
Concrete Slab
6" Berm
Battery Cage
Compressor
office
office
Break room
Up
Up
Conference room
Locker Room
Inventory
Shipping/ Receiving
Ferrous Metal Scrap
Exterior Loading Dock
Storm Drain B
Filter Sock
office
office
Lobby
office
office
6" Berm
To Storm Drain
Parking Lot
Landscaped Area
Electric Gate
Legend
Water Flow Direction
Compass
Filter Sock
Scale: 0.16 inches = 1 foot
METECH RECYCLING
6200 Engle Way
Gilroy CA 95020
Updated July 21, 2014
N
Filter Sock
Storm Drain C

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**EXHIBIT B – CWA Notice of Violation and Intent to Sue Letter**

26
27
28



June 2, 2014

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Metech International, LLC                      Metech Recycling, Inc
120 Mapleville Main Street                     150 Blackstone River Road
Mapleville, RI 02839                           Worcester, MA 01607

Metech International, LLC                      Joseph Fulton
6200 Engel Way                                 Metech Recycling, Inc
Gilroy, CA 95020                               6200 Engel Way
                                               Gilroy, CA 95020

**Re:    Notice of Violations and Intent to File Suit Under the Federal Water
         Pollution Control Act**

Dear Mr. Fulton:

     I am writing on behalf of the California Sportfishing Protection Alliance
("CSPA") in regard to violations of the Clean Water Act ("the Act") occurring at Metech
International, LLC's ("Metech") scrap metal recycling facility located at 6200 Engel
Way, in Gilroy, California ("the Facility"). The WDID number for the Facility is
343I017535. CSPA is a non-profit public benefit corporation dedicated to the
preservation, protection and defense of the environment, wildlife and natural resources of
California waters, including Llagas Creek, the Pajaro River, and the Monterey Bay. This
letter is being sent to you as the responsible owner, officer, or operator of the Facility.
Unless otherwise noted, Joseph Fulton and Metech International, LLC shall hereinafter
be collectively referred to as "Metech."

     This letter addresses Metech's unlawful discharges of pollutants from the Facility
to Llagas Creek, which then conveys that storm water into the Pajaro River, which
ultimately flows into Monterey Bay. This letter addresses the ongoing violations of the
substantive and procedural requirements of the Clean Water Act and National Pollutant
Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water

Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order
No. 97-03-DWQ ("General Permit" or "General Industrial Storm Water Permit").

Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the
initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen
must give notice of intent to file suit. Notice must be given to the alleged violator, the
U.S. Environmental Protection Agency, and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File
Suit provides notice of the violations that have occurred, and continue to occur, at the
Facility. Consequently, Joseph Fulton and Metech International, LLC are hereby placed
on formal notice by CSPA that, after the expiration of sixty (60) days from the date of
this Notice of Violation and Intent to File Suit, CSPA intends to file suit in federal court
against Joseph Fulton, and Metech International, LLC under Section 505(a) of the Clean
Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the General
Permit. These violations are described more fully below.

## I.      Background.

The Facility is located at 6200 Engel Way in the city of Gilroy. The Facility falls
under Standard Industrial Classification ("SIC") Code 5093 ("Processing, Reclaiming,
and Wholesale Distribution of Scrap and Waste Materials"). CSPA's investigation into
the industrial activities at Metech's 3-acre Facility has revealed that The Facility is used
to receive, store, handle, recycle and transport commercial, residential, and non-
hazardous industrial waste and recyclables waste, including appliances, furniture, brush
and yard waste, household garbage, wood, aluminum and tin cans, cardboard, glass
bottles and jars, mixed paper, white goods and some plastic containers. Other activities
at the Facility include the use and storage of heavy machinery and motorized vehicles,
including trucks used to haul materials to, from and within the Facility, as well as the
dispensing of diesel fuel.

Metech collects and discharges storm water from the Facility through at least
three (3) discharge points into Llagas Creek, which then conveys that storm water into
the Pajaro River, which ultimately flows into Monterey Bay. Llagas Creek, the Pajaro
River and Monterey Bay are waters of the United States within the meaning of the Clean
Water Act.

The Central Coast Regional Water Quality Control Board ("Regional Board") has
established water quality standards for Llagas Creek, the Pajaro River, and Monterey Bay
in the "Water Quality Control Plan for the Central Coast Basin" ("Basin Plan"). The
Basin Plan incorporates in its entirety the State Board's "Water Quality Control Plan for
Ocean Waters of California" ("Ocean Plan"). The Ocean Plan "sets forth limits or levels
of water quality characteristics for ocean waters to ensure the reasonable protection of
beneficial uses and the prevention of nuisance. The discharge of waste shall not cause
violation of these objectives." *Id*. at 4. The Ocean Plan limits the concentration of

organic materials in marine sediment to levels that would not degrade marine life.  *Id*. at 6.  The Basin Plan establishes ocean water quality objectives, including that dissolved oxygen is not to be less than 7.0 mg/l and pH must be between 7.0 - 8.5 s.u.  *Id*. at III-2.  It also establishes that toxic metal concentrations in marine habitats shall not exceed:  Cu – 0.01 mg/L; Pb – 0.01 mg/L; Hg – 0.0001 mg/L; Ni – 0.002 mg/L; and, Zn – 0.02 mg/L. *Id.* at III-12.

The Basin Plan provides maximum contaminant levels ("MCLs") for organic concentrations and inorganic and fluoride concentrations, not to be exceeded in domestic or municipal supply.  *Id*. at III-6 - III-7.  It requires that water designated for use as domestic or municipal supply shall not exceed the following maximum contaminant levels: aluminum – 1.0 mg/L; arsenic - 0.05 mg/L; lead - 0.05 mg/L; and mercury - 0.002 mg/L.  *Id*. at III-7.  The EPA has also issued recommended water quality criterion MCLs, or Treatment Techniques, for mercury - 0.002 mg/L; lead – 0.015 mg/L; chromium – 0.1 mg/L; and, copper – 1.3 mg/L.  The EPA has also issued a recommended water quality criterion for aluminum for freshwater aquatic life protection of 0.087 mg/L.  In addition, the EPA has established a secondary MCL, consumer acceptance limit for aluminum - 0.05 mg/L to 0.2 mg/L, and for zinc - 5.0 mg/L.  *See* http://www.epa.gov/safewater/ mcl.html.  Finally, the California Department of Health Services has established the following MCL, consumer acceptance levels: aluminum – 1 mg/L (primary) and 0.2 mg/L (secondary); chromium – 0.5 mg/L (primary); copper – 1.0 mg/L (secondary); iron – 0.3 mg/L; and zinc – 5.0 mg/L.  *See* California Code of Regulations, title 22, §§ 64431, 64449.

The California Toxics Rule ("CTR"), issued by the EPA in 2000, establishes numeric receiving water limits for certain toxic pollutants in California surface waters. 40 C.F.R. § 131.38**.**  The CTR establishes the following numeric limits for freshwater surface waters:  arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L (continuous concentration); chromium (III) – 0.550 mg/L (maximum concentration) and 0.180 mg/L (continuous concentration); copper – 0.013 mg/L (maximum concentration) and 0.009 mg/L (continuous concentration); and lead – 0.065 mg/L (maximum concentration) and 0.0025 mg/L (continuous concentration).

The Regional Board has identified waters of the Central Coast as failing to meet water quality standards for pollutant/stressors such as unknown toxicity, numerous pesticides, and mercury.[1]  Discharges of listed pollutants into an impaired surface water may be deemed a "contribution" to an exceedance of the CTR, a water quality standard, and may indicate a failure on the part of a discharger to implement adequate storm water pollution control measures.  *See Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 375 F.3d 913, 918 (9th Cir. 2004); *see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 2005 WL 2001037 at *3, 5 (E.D. Cal., Aug. 19, 2005) (finding that a discharger

---

[1] *See* http://www.waterboards.ca.gov/water_issues/programs/tmdl/2010state_ir_reports/category5_ report.shtml.

covered by the General Industrial Storm Water Permit was "subject to effluent limitations as to certain pollutants, including zinc, lead, copper, aluminum and lead" under the CTR).

The General Permit incorporates benchmark levels established by EPA as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants discharged by Metech: Total Suspended Solids – 100 mg/L; Chemical Oxygen Demand – 120 mg/L; Iron - 1 mg/L; Aluminum - 0.75 mg/L; Copper – 15 mg/L; Zinc - 0.117 mg/L; Magnesium - 0.0636 mg/L; Cadmium - 0.0159 mg/L; Mercury - 0.0024 mg/L; Lead - 0.0816 mg/L; and Silver - 0.0318 mg/L. The State Water Quality Control Board has also proposed adding a benchmark level for specific conductance of 200 μmhos/cm.

## II.    Metech Is Violating the Act by Discharging Pollutants From the Facility to Waters of the United States.

Under the Act, it is unlawful to discharge pollutants from a "point source" to navigable waters without obtaining and complying with a permit governing the quantity and quality of discharges. *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984). Section 301(a) of the Clean Water Act prohibits "the discharge of any pollutants by any person . . ." except as in compliance with, among other sections of the Act, Section 402, the NPDES permitting requirements. 33 U.S.C. § 1311(a). The duty to apply for a permit extends to "[a]ny person who discharges or proposes to discharge pollutants. . . ." 40 C.F.R. § 122.30(a).

The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, a variety of metals, chemical wastes, biological materials, heat, rock, and sand discharged into water. 33 U.S.C. § 1362(6). A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). An industrial facility that discharges pollutants into a navigable water is subject to regulation as a "point source" under the Clean Water Act. *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993). "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7). Navigable waters under the Act include man-made waterbodies and any tributaries or waters adjacent to other waters of the United States. *See Headwaters, Inc. v Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001).

Llagas Creek, the Pajaro River, and Monterey Bay are waters of the United States. Accordingly, Metech's discharges of storm water containing pollutants from the Facility are discharges to waters of the United States.

CSPA is informed and believes, and thereupon alleges, that Metech has discharged, and continues to discharge, pollutants from the Facility to waters of the United States every day that there has been or will be any measurable discharge of storm water from the Facility since May 12, 1997.  Each discharge on each separate day is a separate violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These unlawful discharges are ongoing.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Metech is subject to penalties for violations of the Act since June 2, 2009.

### III.      Pollutant Discharges in Violation of the NPDES Permit.

Metech has violated and continues to violate the terms and conditions of the General Permit.  Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit such as the General Permit.  33 U.S.C. § 1342.  The General Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Conventional pollutants are TSS, Oil & Grease ("O&G"), pH, biochemical oxygen demand ("BOD"), and fecal coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id*.; 40 C.F.R. § 401.15.

Further, Discharge Prohibition A(1) of the General Permit provides:  "Except as allowed in Special Conditions (D.1.) of this General Permit, materials other than storm water (non-storm water discharges) that discharge either directly or indirectly to waters of the United States are prohibited.  Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit."  Special Conditions D(1) of the General Permit sets forth the conditions that must be met for any discharge of non-storm water to constitute an authorized non-storm water discharge.

Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

Based on its review of available public documents, CSPA is informed and believes: (1) that Metech continues to discharge pollutants in excess of benchmarks and (2) that Metech has failed to implement BMPs adequate to bring its discharge of these and other pollutants in compliance with the General Permit.  Metech's ongoing violations are discussed further below.

Notice of Violation and Intent To File Suit
June 2, 2014
Page 6 of 19

### A. Metech Has Discharged Storm Water Containing Pollutants in Violation of the Permit.

Metech has discharged and continues to discharge storm water with unacceptable levels of Total Suspended Solids, Chemical Oxygen Demand, Iron, Aluminum, Copper, Zinc, Magnesium, Cadmium, Mercury, Lead and Silver in violation of the General Permit. These high pollutant levels have been documented during significant rain events, including the rain events indicated in the table of rain data attached hereto as Attachment A. Metech's Annual Reports and Sampling and Analysis Results confirm discharges of materials other than storm water and specific pollutants in violation of the Permit provisions listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit:

### 1. Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentration in Excess of Applicable EPA Benchmark Value.

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------------|-----------|----------------------------|-----------------|
| 3/21/11 | Storm Drain A | TSS | 101 mg/L | 100 mg/l |
| 3/21/11 | Storm Drain B | TSS | 101 mg/L | 100 mg/l |

### 2. Discharge of Storm Water Containing Chemical Oxygen Demand (COD) at Concentration in Excess of Applicable EPA Benchmark Value.

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------------|-----------|----------------------------|-----------------|
| 3/21/11 | Storm Drain A | COD | 148 mg/l | 120 mg/l |
| 3/21/11 | Storm Drain B | COD | 137 mg/l | 120 mg/l |

Notice of Violation and Intent To File Suit
June 2, 2014
Page 7 of 19

**3.** **Discharge of Storm Water Containing Iron (Fe) at Concentration in Excess of Proposed Benchmark.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|----------------|-----------|---------------------------|-----------------|
| 2/24/10 | Storm Drain A | Fe | 1.741 mg/L | 1 mg/L |
| 2/24/10 | Storm Drain B | Fe | 1.056 mg/L | 1 mg/L |
| 3/21/11 | Storm Drain A | Fe | 1.121 mg/L | 1 mg/L |
| 3/21/11 | Storm Drain C | Fe | 1.129 mg/L | 1 mg/L |
| 2/29/12 | Storm Drain C | Fe | 1.169 mg/L | 1 mg/L |

**4.** **Discharge of Storm Water Containing Aluminum (Al) at Concentration in Excess of Proposed Benchmark.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|----------------|-----------|---------------------------|-----------------|
| 2/24/10 | Storm Drain B | Al | 0.791 mg/L | 0.75 mg/L |

**5.** **Discharge of Storm Water Containing Copper (Cu) at Concentration in Excess of Proposed Benchmark.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|----------------|-----------|---------------------------|-----------------|
| 2/24/10 | Storm Drain A | Cu | 0.28 mg/L | 0.0636 mg/L |
| 2/24/10 | Storm Drain B | Cu | 0.19 mg/L | 0.0636 mg/L |
| 2/24/10 | Storm Drain C | Cu | 0.208 mg/L | 0.0636 mg/L |
| 3/21/11 | Storm Drain A | Cu | 0.213 mg/L | 0.0636 mg/L |

Notice of Violation and Intent To File Suit
June 2, 2014
Page 8 of 19

| 3/21/11 | Storm Drain B | Cu | 0.075 mg/L | 0.0636 mg/L |
|---|---|---|---|---|
| 3/21/11 | Storm Drain C | Cu | 0.073 mg/L | 0.0636 mg/L |
| 2/29/12 | Storm Drain A | Cu | 0.147 mg/L | 0.0636 mg/L |
| 2/29/12 | Storm Drain B | Cu | 0.155 mg/L | 0.0636 mg/L |
| 2/29/12 | Storm Drain C | Cu | 0.106 mg/L | 0.0636 mg/L |
| 11/30/12 | Storm Drain A | Cu | 0.084 mg/L | 0.0636 mg/L |
| 11/30/12 | Storm Drain B | Cu | 0.087 mg/L | 0.0636 mg/L |
| 11/30/12 | Storm Drain C | Cu | 0.088 mg/L | 0.0636 mg/L |

**6.    Discharge of Storm Water Containing Zinc (Zn) at Concentration in Excess of Proposed Benchmark.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 2/24/10 | Storm Drain A | Zn | 0.864 mg/L | 0.117 mg/L |
| 2/24/10 | Storm Drain B | Zn | 0.3 mg/L | 0.117 mg/L |
| 2/24/10 | Storm Drain C | Zn | 0.341 mg/L | 0.117 mg/L |
| 3/21/11 | Storm Drain A | Zn | 0.782 mg/L | 0.117 mg/L |
| 3/21/11 | Storm Drain B | Zn | 0.126 mg/L | 0.117 mg/L |
| 3/21/11 | Storm Drain C | Zn | 0.532 mg/L | 0.117 mg/L |
| 2/29/12 | Storm Drain A | Zn | 0.457 mg/L | 0.117 mg/L |

Notice of Violation and Intent To File Suit
June 2, 2014
Page 9 of 19

| 2/29/12 | Storm Drain B | Zn | 0.344 mg/L | 0.117 mg/L |
|---------|---------------|-----|------------|------------|
| 2/29/12 | Storm Drain C | Zn | 0.23 mg/L | 0.117 mg/L |
| 11/30/12 | Storm Drain A | Zn | 0.426 mg/L | 0.117 mg/L |
| 11/30/12 | Storm Drain B | Zn | 0.457 mg/L | 0.117 mg/L |
| 11/30/12 | Storm Drain C | Zn | 0.402 mg/L | 0.117 mg/L |

**7.    Discharge of Storm Water Containing Magnesium (Mg) at Concentration in Excess of Proposed Benchmark.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------------|-----------|----------------------------|-----------------|
| 2/24/10 | Storm Drain A | Mg | 1.1 mg/L | 0.0636 mg/L |
| 2/24/10 | Storm Drain B | Mg | 1.3 mg/L | 0.0636 mg/L |
| 2/24/10 | Storm Drain C | Mg | 2.6 mg/L | 0.0636 mg/L |
| 3/21/11 | Storm Drain A | Mg | 1.0 mg/L | 0.0636 mg/L |
| 3/21/11 | Storm Drain B | Mg | 0.9 mg/L | 0.0636 mg/L |
| 3/21/11 | Storm Drain C | Mg | 1.8 mg/L | 0.0636 mg/L |
| 2/29/12 | Storm Drain A | Mg | 0.6 mg/L | 0.0636 mg/L |
| 2/29/12 | Storm Drain B | Mg | 1.0 mg/L | 0.0636 mg/L |
| 2/29/12 | Storm Drain C | Mg | 0.9 mg/L | 0.0636 mg/L |
| 11/30/12 | Storm Drain A | Mg | 0.6 mg/L | 0.0636 mg/L |

Notice of Violation and Intent To File Suit
June 2, 2014
Page 10 of 19

| 11/30/12 | Storm Drain B | Mg | 0.5 mg/L | 0.0636 mg/L |
|----------|---------------|-----|----------|-------------|
| 11/30/12 | Storm Drain C | Mg | 0.6 mg/L | 0.0636 mg/L |

8. **Discharge of Storm Water Containing Cadmium (Cd) at Concentration in Excess of Proposed Benchmark.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------------|-----------|----------------------------|-----------------|
| 2/24/10 | Storm Drain A | Cd | 0.199 mg/L | 0.0159 mg/L |
| 2/24/10 | Storm Drain B | Cd | 0.022 mg/L | 0.0159 mg/L |
| 3/21/11 | Storm Drain A | Cd | 0.06 mg/L | 0.0159 mg/L |
| 2/29/12 | Storm Drain A | Cd | 0.034 mg/L | 0.0159 mg/L |
| 11/30/12 | Storm Drain A | Cd | 0.019 mg/L | 0.0159 mg/L |
| 11/30/12 | Storm Drain B | Cd | 0.02 mg/L | 0.0159 mg/L |
| 11/30/12 | Storm Drain C | Cd | 0.017 mg/L | 0.0159 mg/L |

9. **Discharge of Storm Water Containing Mercury (Hg) at Concentration in Excess of Proposed Benchmark.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------------|-----------|----------------------------|-----------------|
| 2/24/10 | Storm Drain A | Hg | 0.007 mg/L | 0.0024 mg/L |
| 3/21/11 | Storm Drain A | Hg | 0.005 mg/L | 0.0024 mg/L |
| 3/21/11 | Storm Drain C | Hg | 0.868 mg/L | 0.0024 mg/L |

### 10. Discharge of Storm Water Containing Lead (Pb) at Concentration in Excess of Proposed Benchmark.

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------------|-----------|----------------------------|-----------------|
| 2/24/10 | Storm Drain A | Pb | 0.104 mg/L | 0.0816 mg/L |
| 2/24/10 | Storm Drain B | Pb | 0.125 mg/L | 0.0816 mg/L |
| 2/24/10 | Storm Drain C | Pb | 0.097 mg/L | 0.0816 mg/L |
| 3/21/11 | Storm Drain A | Pb | 0.089 mg/L | 0.0816 mg/L |
| 2/29/12 | Storm Drain A | Pb | 0.088 mg/L | 0.0816 mg/L |

### 11. Discharge of Storm Water Containing Silver (Ag) at Concentration in Excess of Proposed Benchmark.

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------------|-----------|----------------------------|-----------------|
| 3/21/11 | Storm Drain A | Ag | 0.061 mg/L | 0.0318 mg/L |
| 2/29/12 | Storm Drain C | Ag | 0.063 mg/L | 0.0318 mg/L |

CSPA's investigation, including its review of Metech's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's Benchmark values and the State Board's proposed benchmark levels for specific conductivity, indicates that Metech has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids, Chemical Oxygen Demand, Iron, Aluminum, Copper, Zinc, Magnesium, Cadmium, Mercury, Lead and Silver in violation of Effluent Limitation B(3) of the General Permit. Metech was required to have implemented BAT and BCT by no later than October 1, 1992 or the start of its operations. Thus, Metech is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

CSPA is informed and believes that Metech has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least June 2, 2009. CSPA alleges that such violations also have occurred and will occur on other rain dates, including during every single significant rain event that has occurred since June 2, 2009, and that will occur at the Facility subsequent to the date of

this Notice of Violation and Intent to File Suit.  Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Metech has discharged storm water containing impermissible levels of Total Suspended Solids, Chemical Oxygen Demand, Iron, Aluminum, Copper, Zinc, Magnesium, Cadmium, Mercury, Lead and Silver in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing.  Each discharge of storm water containing any pollutants from the Facility without the implementation of BAT/BCT constitutes a separate violation of the General Permit and the Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Metech is subject to penalties for violations of the General Permit and the Act since June 2, 2009.

**B.  Metech Has Failed to Implement an Adequate Monitoring & Reporting Plan.**

Section B of the General Industrial Storm Water Permit requires that dischargers develop and implement an adequate Monitoring and Reporting Plan by no later than October 1, 1992 or the start of operations.  Sections B(3), B(4) and B(7) require that dischargers conduct regularly scheduled visual observations of non-storm water and storm water discharges from the Facility and to record and report such observations to the Regional Board.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All storm water discharge locations shall be sampled."  Section B(5)(c)(i) further requires that the samples shall be analyzed for total suspended solids, pH, specific conductance, and total organic carbon.  Oil and grease may be substituted for total organic carbon.  Section B(5)(c)(ii) of the General Permit further requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."  Section B(10) of the General Permit provides that "Facility operators shall explain how the Facility's monitoring program will satisfy the monitoring program objectives of [General Permit] Section B.2."

Based on its investigation, CSPA is informed and believes that Metech has failed to develop and implement an adequate Monitoring & Reporting Plan.  As an initial matter, based on its review of publicly available documents, CSPA is informed and believes that Metech has failed to collect storm water samples during at least two qualifying storms events, as defined by the General Permit, during the past four Wet Seasons.  Moreover, based on its review of publicly available documents, CSPA is informed and believes that Metech has failed to conduct the monthly visual monitoring of storm water discharges and the quarterly visual observations of unauthorized non-storm water discharges required under the General Permit during the past three Wet Seasons.

Each of these failures constitutes a separate and ongoing violation of the General Permit and the Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the Clean Water Act, Metech is subject to penalties for violations of the General Permit and the Act since June 2, 2009.  These violations are set forth in greater detail below:

    **1.**      **Metech Has Failed to Collect Qualifying Storm Water Samples During at Least Two Rain Events In Each of the Last Four Wet Seasons.**

Based on its review of publicly available documents, CSPA is informed and believes that Metech has failed to collect storm water samples from all discharge points during at least two qualifying rain events at the Facility during each of the past four Wet Seasons, as required by the General Permit.  For example, CSPA notes that the Annual Report filed by Metech for the Facility for the 2009-2010 Wet Season reported that Metech only sampled from one qualifying storm event within the meaning of the General Permit even though there were many qualifying storm events from which to sample (discussed further below).  Similarly, in the 2010-2011 Annual Report and the 2011-2012 Annual Report, Metech only sampled from one storm event that was a qualifying storm event.  Furthermore, in the 2012-2013 Annual Report, Metech failed to sample from two qualifying storm events for that season, as required by the General Permit.

Metech reported in its Annual Reports for the 2010-2011, 2011-2012, and 2012-2013 Wet Seasons that the Facility did not sample the first qualifying storm event of the season because there was not a qualifying storm event from which to obtain a sample, when in fact there were numerous opportunities to sample from the first qualifying storm event.  For example, Metech reported in its 2010-2011 Annual Report that it did not sample the first storm event of the Wet Season because it was not a qualifying storm event.  However, based upon its review of publicly available rainfall data, CSPA is informed and believes that the first qualifying storm event of the 2010-2011 Wet Season occurred as early as Friday, October 22, 2010, when 0.12" of rain fell on the Facility.

These failures to adequately monitor storm water discharges constitute separate and ongoing violations of the General Permit and the Act.

    **2.**      **Metech Has Failed to Conduct the Monthly Wet Season Observations of Storm Water Discharges Required by the General Permit.**

The General Permit requires dischargers to "visually observe storm water discharges from one storm event per month during the Wet Season (October 1 – May 30)."  General Permit, Section B(4)(a).  As evidenced by the entries on Form 4 Monthly Visual Observations contained in Metech's annual reports for four of the last five Wet Seasons, CSPA is informed and believes that Metech has failed to comply with this requirement of the General Permit.

Specifically, Metech failed to conduct monthly visual observations of discharges from qualifying storm events for most months during the past three Wet Seasons. Instead, Metech either completely failed to document visual observations at all or documented its visual observations of storm water that discharged during non-qualifying storm events, for most months during the entire past three Wet Seasons (discussed further below). However, based on publicly available rainfall data, CSPA is informed and believes that there were many qualifying storm events during each of these Wet Seasons that Metech could have observed.

For example, Metech reported in its 2010-2011 Annual Report that only observed one qualifying storm event for the entire season. Further, Metech reported in its 2011-2012 Annual Report that it failed to conduct observations for all but one month of the Wet Season. Metech's failure to conduct this required monthly Wet Season visual monitoring extends back to at least June 2, 2009. Metech's failure to conduct this required monthly Wet Season visual monitoring has caused and continues to cause multiple, separate and ongoing violations of the General Permit and the Act.

### 3.     Metech Is Subject to Penalties for Its Failure to Implement an Adequate Monitoring & Reporting Plan Since June 2, 2009.

CSPA is informed and believes that publicly available documents demonstrate Metech's consistent and ongoing failure to implement an adequate Monitoring Reporting Plan in violation of Section B of the General Permit. For example, Metech has consistently failed to collect samples of storm water discharged during two qualifying storm events for the past four wet seasons. For example, Metech reported in its 2012-2013 Annual report that it only sampled from one qualifying storm event, even though there were numerous opportunities to sample from such an event. Further, in that same 2012-2013 Annual Report the storm event that Metech did sample, was not a qualifying storm event. Based on its review of publicly available rainfall data, CSPA is informed and believes that the storm that occurred at the Facility on November 30, 2012 was not a qualifying storm event because two days earlier 0.52" of rain fell at the Facility. Thus, the November 28, 2012 storm event rendered any storm occurring for three days afterwards non-qualifying. Therefore, Metech failed to implement an adequate Monitoring Reporting Plan.

Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, the City of Watsonville is subject to penalties for these violations of the General Permit and the Act since June 2, 2009.

### C.     Metech Has Failed to Implement BAT and BCT.

Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for

toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and
BCT include both nonstructural and structural measures.  General Permit, Section A(8).
CSPA's investigation indicates that Metech has not implemented BAT and BCT at the
Facility for its discharges of Total Suspended Solids, Chemical Oxygen Demand, Iron,
Aluminum, Copper, Zinc, Magnesium, Cadmium, Mercury, Lead, Silver and other
unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

 To meet the BAT/BCT requirement of the General Permit, Metech must evaluate
all pollutant sources at the Facility and implement the best structural and non-structural
management practices economically achievable to reduce or prevent the discharge of
pollutants from the Facility.  Based on the limited information available regarding the
internal structure of the Facility, CSPA believes that at a minimum Metech must improve
its housekeeping practices, store materials that act as pollutant sources under cover or in
contained areas, treat storm water to reduce pollutants before discharge (e.g., with filters
or treatment boxes), and/or prevent storm water discharge altogether.  Metech has failed
to adequately implement such measures.

 Metech was required to have implemented BAT and BCT by no later than
October 1, 1992.  Therefore, Metech has been in continuous violation of the BAT and
BCT requirements every day since October 1, 1992, and will continue to be in violation
every day that it fails to implement BAT and BCT.  Metech is subject to penalties for
violations of the General Permit and the Act occurring since June 2, 2009.

 **D.  Metech Has Failed to Develop and Implement an Adequate Storm
 Water Pollution Prevention Plan.**

 Section A(1) and Provision E(2) of the General Permit require dischargers of
storm water associated with industrial activity to develop, implement, and update an
adequate storm water pollution prevention plan ("SWPPP") no later than October 1,
1992.  Section A(1) and Provision E(2) requires dischargers who submitted an NOI
pursuant to Water Quality Order No. 97-03-DWQ to continue following their existing
SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but
in any case, no later than August 9, 1997.

 The SWPPP must, among other requirements, identify and evaluate sources of
pollutants associated with industrial activities that may affect the quality of storm and
non-storm water discharges from the Facility and identify and implement site-specific
best management practices ("BMPs") to reduce or prevent pollutants associated with
industrial activities in storm water and authorized non-storm water discharges (General
Permit, Section A(2)).  The SWPPP must also include BMPs that achieve BAT and BCT
(Effluent Limitation B(3)).  The SWPPP must include: a description of individuals and
their responsibilities for developing and implementing the SWPPP (General Permit,
Section A(3)); a site map showing the Facility boundaries, storm water drainage areas
with flow pattern and nearby water bodies, the location of the storm water collection,
conveyance and discharge system, structural control measures, impervious areas, areas of

Notice of Violation and Intent To File Suit
June 2, 2014
Page 16 of 19

actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).  Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedance of water quality standards.

CSPA's investigation and review of publicly available documents regarding conditions at the Facility indicate that Metech has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above.  Metech has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary.  Accordingly, Metech has been in continuous violation of Section A(1) and Provision E(2) of the General Permit every day since October 1, 1992, and will continue to be in violation every day that it fails to develop and implement an effective SWPPP.  Metech is subject to penalties for violations of the General Permit and the Act occurring since June 2, 2009.

> **E.      Metech Has Failed to Address Discharges Contributing to Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.

The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard.  Receiving Water Limitation C(4)(a).  Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance.  *See also* Provision E(6).  Lastly, Section A(9) of the Permit requires

an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, Metech is discharging elevated levels of Total Suspended Solids, Chemical Oxygen Demand, Iron, Aluminum, Copper, Zinc, Magnesium, Cadmium, Mercury, Lead, Silver and other unmonitored pollutants that are causing or contributing to exceedances of applicable water quality standards.  For each of these pollutant exceedances, Metech was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Based on CSPA's review of available documents, Metech was aware of high levels of these pollutants prior to June 2, 2009.  Likewise, Metech has generally failed to file reports describing its non-compliance with the General Permit in violation of Section C(11)(d).  Metech has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the General Permit every day since June 2, 2009, and will continue to be in violation every day it fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs.  Metech is subject to penalties for violations of the General Permit and the Act occurring since June 2, 2009.

**F.     Metech Has Failed to File Timely, True and Correct Reports.**

Section B(14) of the General Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit.  *See also* General Permit, Sections C(9) and (10) and B(14).

CSPA's investigation indicates that Metech has submitted incomplete Annual Reports and purported to comply with the General Permit despite significant noncompliance at the Facility.  For example, Metech reported in four Annual Reports filed for the past four Wet Seasons (i.e., 2009-2010, 2010-2011, 2011-2012, and 2012-2013) that it observed storm water discharges occurring during the first storm of those Wet Seasons.  However, as discussed above, based on CSPA's review of publicly available rainfall data, CSPA believes this is incorrect.

Further, Metech failed to sample from qualifying storm events in three out of the four storm water samples collected during the last three Wet Seasons.  For example, in 2009-2010, Metech sampled from a storm event on February 24, 2010 that was not a qualifying storm event.  Further, in the 2010-2011 Annual Report, Metech report that it did not sample from the first qualifying storm event without adequate explanation.

Notice of Violation and Intent To File Suit
June 2, 2014
Page 18 of 19

Metech also failed to comply with the monthly visual observations of storm water discharges requirement for two of the past three Annual Reports filed for the Facility.   In the 2010-2011 Annual Report, Metech only observed discharge from one qualifying storm event for the entire 2010-2011 wet season.  Moreover, in the 2011-2012 Annual Report, Metech only observed discharge from one qualifying storm event for the entire wet season.

These are only a few examples of how Metech has failed to file completely true and accurate reports.  As indicated above, Metech has failed to comply with the Permit and the Act consistently for the past three years; therefore, Metech has violated Sections A(9)(d), B(14) and C(9) & (10) of the Permit every time Metech submitted an incomplete or incorrect annual report that falsely certified compliance with the Act in the past three years.  Metech's failure to submit true and complete reports constitutes continuous and ongoing violations of the Permit and the Act.  Metech is subject to penalties for violations of Section (C) of the General Permit and the Act occurring since June 2, 2009.

**IV.     Persons Responsible for the Violations.**

CSPA puts Joseph Fulton and Metech International, LCC on notice that they are the persons responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Joseph Fulton and Metech International, LLC on formal notice that it intends to include those persons in this action.

**V.      Name and Address of Noticing Party.**

Our name, address and telephone number is as follows:  California Sportfishing Protection Alliance, Bill Jennings, Executive Director; 3536 Rainier Avenue, Stockton, CA 95204; Phone: (209) 464-5067.

**VI.     Counsel.**

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard
John J. Prager
Law Offices of Andrew L. Packard
100 Petaluma Boulevard North, Suite 301
Petaluma, CA 94952
Tel. (707) 763-7227
Email: Andrew@PackardLawOffices.com

Notice of Violation and Intent To File Suit
June 2, 2014
Page 19 of 19

**VII.    Penalties.**

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Joseph Fulton and Metech International, LLC to a penalty of up to $37,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Joseph Fulton and Metech International, LLC and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

## SERVICE LIST

Gina McCarthy, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld
Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Eric Holder
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Thomas Howard, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Kenneth A. Harris, Jr., Executive Officer
Regional Water Quality Control Board
Central Coast Region
895 Aerovista Place, Suite 101
San Luis Obispo, CA 93401-7906

**ATTACHMENT A**
**Notice of Intent to File Suit, Metech**
**Significant Rain Events,\* June 2, 2009 – June 2, 2014**

| | | | |
|---|---|---|---|
| Oct 13 2009 | Oct 24 2010 | Jun 4 2011 | Dec 5 2012 |
| Oct 14 2009 | Oct 30 2010 | Jun 28 2011 | Dec 15 2012 |
| Dec 10 2009 | Nov 17 2010 | Oct 5 2011 | Dec 17 2012 |
| Dec 11 2009 | Nov 22 2010 | Nov 4 2011 | Dec 22 2012 |
| Dec 12 2009 | Nov 23 2010 | Nov 5 2011 | Dec 23 2012 |
| Dec 13 2009 | Nov 27 2010 | Nov 11 2011 | Dec 25 2012 |
| Dec 26 2009 | Dec 5 2010 | Nov 18 2011 | Dec 26 2012 |
| Dec 27 2009 | Dec 14 2010 | Nov 19 2011 | Dec 29 2012 |
| Dec 28 2009 | Dec 15 2010 | Nov 20 2011 | Jan 5 2013 |
| Jan 12 2010 | Dec 16 2010 | Jan 19 2012 | Jan 6 2013 |
| Jan 13 2010 | Dec 17 2010 | Jan 20 2012 | Jan 24 2013 |
| Jan 17 2010 | Dec 18 2010 | Jan 21 2012 | Feb 19 2013 |
| Jan 18 2010 | Dec 19 2010 | Jan 22 2012 | Mar 6 2013 |
| Jan 19 2010 | Dec 21 2010 | Jan 23 2012 | Mar 7 2013 |
| Jan 20 2010 | Dec 22 2010 | Feb 7 2012 | Apr 1 2013 |
| Jan 21 2010 | Dec 25 2010 | Feb 13 2012 | Apr 4 2013 |
| Jan 22 2010 | Dec 28 2010 | Feb 15 2012 | Oct 29 2013 |
| Jan 26 2010 | Dec 29 2010 | Feb 29 2012 | Nov 19 2013 |
| Jan 29 2010 | Jan 1 2011 | Mar 1 2012 | Nov 20 2013 |
| Feb 4 2010 | Jan 2 2011 | Mar 16 2012 | Dec 6 2013 |
| Feb 6 2010 | Jan 30 2011 | Mar 17 2012 | Dec 7 2013 |
| Feb 9 2010 | Feb 14 2011 | Mar 18 2012 | Jan 30 2013 |
| Feb 21 2010 | Feb 16 2011 | Mar 24 2012 | Feb 2 2014 |
| Feb 23 2010 | Feb 17 2011 | Mar 25 2012 | Feb 6 2014 |
| Feb 24 2010 | Feb 18 2011 | Mar 27 2012 | Feb 7 2014 |
| Feb 26 2010 | Feb 19 2011 | Mar 28 2012 | Feb 8 2014 |
| Feb 27 2010 | Feb 24 2011 | Mar 31 2012 | Feb 9 2014 |
| Mar 2 2010 | Feb 25 2011 | Apr 10 2012 | Feb 26 2014 |
| Mar 3 2010 | Feb 26 2011 | Apr 11 2012 | Feb 27 2014 |
| Mar 12 2010 | Mar 13 2011 | Apr 12 2012 | Feb 28 2014 |
| Mar 30 2010 | Mar 16 2011 | Apr 13 2012 | Mar 1 2014 |
| Apr 4 2010 | Mar 18 2011 | Apr 25 2012 | Mar 3 2014 |
| Apr 5 2010 | Mar 19 2011 | Jun 4 2012 | Mar 26 2014 |
| Apr 11 2010 | Mar 20 2011 | Oct 22 2012 | Mar 29 2014 |
| Apr 12 2010 | Mar 21 2011 | Oct 23 2012 | Mar 31 2014 |
| Apr 20 2010 | Mar 23 2011 | Nov 16 2012 | Apr 1 2014 |
| Apr 21 2010 | Mar 24 2011 | Nov 17 2012 | Apr 4 2014 |
| Apr 27 2010 | Mar 25 2011 | Nov 18 2012 | |
| Apr 28 2010 | Mar 26 2011 | Nov 28 2012 | |
| May 10 2010 | Apr 8 2011 | Nov 29 2012 | |
| May 27 2010 | May 15 2011 | Nov 30 2012 | |
| Oct 17 2010 | May 16 2011 | Dec 1 2012 | |
| Oct 23 2010 | May 17 2011 | Dec 2 2012 | |

\* Dates gathered from publicly available rain and weather data collected at stations located near the
  Facility.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT C – Map Identifying All Facility Areas**
**Resurfaced Pursuant to Paragraph 2(b)**



**EXHIBIT D**

| Parameter | Level of Potential Concern Value (EPA Benchmark Value) |
|---|---|
| pH | 6.0 – 9.0 |
| Specific Conductivity | 200 µmhos/cm |
| Total Suspended Solids | 100 mg/L |
| Oil & Grease | 15 mg/L |
| Chemical Oxygen Demand | 120 mg/L |
| Biological Oxygen Demand | 30 mg/L |
| Iron | 1.0 mg/L |
| Lead | 0.0816 mg/L |
| Aluminum | 0.75 mg/L |
| Copper | 0.0636 mg/L |
| Zinc | 0.117 mg/L |
| Magnesium | 0.0636 mg/L |
| Cadmium | 0.0159 mg/L |
| Mercury | 0.0024 mg/L |
| Silver | 0.0318 mg/L |
| Arsenic | 0.16854 mg/L |